COPY IN CHAMBERS



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2003 JUL 22  AM 10: 51

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MICHAEL CASCIO | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 02-2115 |
| | * | |
| TMA MARINE, INC., ET AL | * | SECTION "L"/MAG. 5 |
| | * | |

**********************************************************************************

### FLAG CONTAINER SERVICES, INC.'S COMBINED REPLY
### TO THE OPPOSITIONS FILED BY TMA MARINE, INC.,
### GREAT LAKES DREDGE & DOCK COMPANY, AND MICHAEL CASCIO
### TO FLAG CONTAINER'S MOTION FOR SUMMARY JUDGMENT

Flag Container Services, Inc. ("Flag Container"), third party defendant, through its counsel of record, submits the following Combined Reply Brief regarding the cross-motion for summary judgment set for hearing on July 23, 2003.

### I. The Open Manhole On The Bulkhead Of
### Flag Container Services, Inc. Was An Open
### And Obvious Hazard Under New York Law.

In his opposition to Flag Container's Motion for Summary Judgment, Michael Cascio argues that the open and plainly visible manhole on the Flag Container bulkhead, was not an "open and obvious" hazard. In support of this contention, Mr. Cascio cites two New York cases, DeConno v. Golub Corp., 255 A.D.2d 734 (3 App. Div. 1998), and Walters v. County of

___ Fee_____
___ Process____
_X_ Dktd_____
___ CtRmDep____
___ Doc. No._____

Rensselaer, 282 A.D.2d 944 (3 App. Div. 2001). The first of these cases, DeConno, occurred when a plaintiff slipped on an orange warning cone which had been placed on a store floor due to wetness from a leaking roof. The cone had been placed on an aisle directly around a corner, and was not visible from the main walkway of the store. When plaintiff turned the corner abruptly, she came upon the cone without warning, slipped, and fell. In holding that the cone was not an "open and obvious danger," the Court said:

> Given the location of the cone -- plaintiff avers that she had "barely stepped into the aisle" after turning the corner when she tripped over it -- along with other evidence allowing for the inference that it may have been partially obscured by other customers, by boxes of merchandise stacked nearby, or by a large display at the end of the aisle, cites omitted, the record presents at least an arguable factual question as to whether the obstacle was readily apparent through "the normal use of one's senses."

DeConno v. Golub Corp., 255 A.D.2d at 728.

Obviously, this case is factually distinguishable from this matter. In the above referenced case, the so-called obvious hazard was obscured by shelving and layout of the store, other customers, and materials piled around the cone. In this case, the manhole was plainly visible from any of the directions from which one might come upon it. The plaintiff recently produced photographs taken shortly after the accident, which demonstrate that the open manhole was plainly visible. See, Exhibit A attached hereto. Instead, all of the testimony indicates that the hole was open, without obstruction, and not close to any structures.

The second case cited by Mr. Cascio, Walters v. County of Rensselaer, 282 A.D.2d 944 (3 App. Div. 2001), concerned a situation where a plaintiff, fishing upon a river adjacent to a

highway, was walking adjacent to the highway when he tripped and fell in a hole. Evidence in that case indicated that the hole was visually obscured from the direction in which plaintiff was walking:

> Here, the photographs of the accident scene depict the condition of the shoulder from many more perspectives than that available to plaintiff as he walked towards the bridge and, in his deposition testimony, plaintiff does not concede that he was not looking where he was walking. Given the appearance of the shoulder as depicted in the photographs taken from plaintiff's position as he approached the bridge, we cannot agree, as a matter of law, that the condition of the shoulder was so obviously dangerous as to eliminate any duty of care owed by the defendant.

Walters v. County of Rensselaer, 282 A.D.2d at 945-946. Again, this case is factually distinguishable from the instant action. Specifically, unlike Walters v. County of Rensselaer, Mr. Cascio is not claiming that his view of the hole from any particular angle was obstructed by any materials or topography. Additionally, Mr. Cascio has admitted in the statement of facts contained in his opposition, that, at the time of the accident, he was walking backwards and thus not paying attention to where he was walking.

Additionally, other evidence establishes that this uncovered manhole was an "open and obvious hazard." In addition to the photographs attached to Flag Container's Motion for Summary Judgment, Flag Container draws the Court's attention to the sworn statement of Scott Castille taken on March 13, 2003, attached as Exhibit B. As noted previously, Mr. Castille was a crewman on the M/V THAD A who helped Mr. Cascio in his attempt to secure the barge at the Flag Container bulkhead. In the course of Mr. Castille's statement, the following exchange

occurred:

> Question: When you first arrived at the Flag Container dock, was it daylight?
>
> Answer: It was daylight.
>
> Question: Could you see the dock clearly?
>
> Answer: I could see the dock clearly. I could see the hole clearly.
>
> Question: You could see the manhole?
>
> Answer: I could see the manhole clearly.
>
> Question: And you were able to see the manhole clearly from where you were located on the mud barge?
>
> Answer: Yeah.
>
> Question: And was Mr. Cascio on that mud barge with you when you first pulled up on the dock?
>
> Answer: Yes, he was with me.

See, Castille Statement, page 7. This establishes that the manhole was clearly observable, and "open and obvious" even from a distance. Thus, any contention on the part of Michael Cascio that the manhole was not an "open and obvious hazard" under New York law, is disingenuous and should be rejected by the Court.

## II. Under New York State Law, An Open And Obvious Hazard Does Relieve A Landowner Of A Duty To Warn Or Protect From The Dangers Associated Thereto.

Counsel for both Mr. Cascio and defendants, TMA Marine, Inc. ("TMA Marine") and Great Lakes Dredge & Dock Company ("Great Lakes"), have cited a number of New York state

law cases which hold that an open and obvious hazard does not relieve a landowner of his duty vis-a-vis maintenance of a property, but rather goes to the establishment of percentages of comparative fault. However it should be noted, that all of the New York state law cases cited by both opposing parties issued from the Fourth Appellate Division of the New York Supreme Court.

In further support of their theory, opposing counsel cites Mickalski v. Home Depot, 225 F.3d 113 (2nd Cir. 2000). In that case, plaintiff who was a customer at Home Depot was searching for merchandise on a shelf at eye level in an aisle in a Home Depot store. A forklift was carrying a four inch pallet at ankle level in the aisle. While viewing the merchandise at eye level, plaintiff tripped over the four inch pallet injuring herself. Home Depot raised the defense about open and obvious hazards stating that the forklift in the aisle was such a hazard, and they were not responsible for injuries occasioned by it. Although the Second Circuit questioned whether the pallet, rather than the forklift, was an open and obvious hazard, they went on to find Home Depot liable for plaintiff's injuries. In doing so, they made a very limited holding to the following question,

> The question is whether New York law imposes a duty of care upon the owner of a place of business to protect or warn a visitor who encounters an open and obvious hazard, when the owner has created the hazard and *has reason to foresee that a customer might be distracted from observing it*. (Cites omitted.) (Emphasis added.)

Mickalski v. Home Depot, 225 F.3d at 116. The Court of Appeals held that a landowner would be responsible for damages caused by such hazard based, at least partially, upon the following theory:

> [D]efendant's displays of merchandise -- particularly the displays above eye level -- would foreseeable distract the plaintiff to such an extent that she could not reasonably have been expected to observe the condition.

As this Court is aware, the ruling of the Second Circuit interpreting New York law is merely persuasive and is in no way a binding interpretation of that state's law.

The unreliable nature of the Second Circuit's opinion is readily apparent in the case of Pinero v. Rite-Aid of New York, 294 A.D.2d 251 (1 App. Div. 2002). In that case, which involved a plaintiff injuring herself after tripping on a display cart in a retail store, the New York Appellate Court interpreted the Second Circuit's holding in Mickalski as follows:

> Mickalski v. Home Depot, 225 F.3d 113 (2nd Cir. 2000), cited by the dissent, presents an interesting theory of negligence liability, but one that we do not view as applicable in the present case... In Mickalski, Home Depot had arranged its warehouse-store premises in such a way as to make it foreseeable that a customer, looking up at merchandise on high shelves, could be distracted from obstacles on the floor. Here, defendant did not have any reason to know or expect that plaintiff might be distracted from observing the presence of the so-called hazardous wagon.

Thus, as in the Pinero case, even if Flag Container had expected uninvited foot traffic upon its bulkhead after the business was closed, it had certainly created no distractions which might have diverted Mr. Cascio's attention away from the open and obvious hole that was 2-3 feet from the bollard that he used to tie off and secure the barge to the bulkhead.

Finally, although opposing counsel in this matter has cited considerable appellate division case law which indicates a split in the New York intermediate state court circuits concerning this issue, Flag Container points to the case of Cimino v. Town of Hempstead, 110 A.D.2d 805 (2

App. Div. 1985), affirmed, 496 N.Y.S.2d 425, 487 N.E.2d 282 (N.Y. 1985), attached as Exhibit

C. In this case, a swimmer sued a seaside community for the failure of its lifeguards to protect

or warn him from unusually and dangerous wave swells. In holding for the defendant, the

appellate division stated:

> However, we find the plaintiff's claim that the town had a duty to
> warn Mr. Cimino of the wave activity to be without merit, it is
> clear from the record that the water conditions were readily
> observable to all of the beach... Moreover, it is well settled that
> "[t]here is no duty to warn against a condition that can be readily
> observed by the reasonable use senses," citing Olsen v. State of
> New York, 30 A.D.2d 759, affirmed, 25 N.Y.2d 665.

Cimino v. Town of Hempstead, 110 A.D.2d at 806. This case was appealed to the Court of

Appeals, the highest Court in New York state, which issued the following ruling:

> On review of submissions pursuant to Section 500.4 of the Rules of
> Court of Appeals, cites omitted, order affirmed, with costs, *for the
> reasons stated in the memorandum at the Appellate Division.*
> (Emphasis added.)

496 N.Y.S.2d 425, 487 N.E.2d 282. Therefore, having adopted the opinion of the Appellate

Division, the Court of Appeals has ruled that there is no duty to warn of an "open or obvious

hazard." Thus, the law of the state has been set by the ruling of the highest court of New York,

and the doctrine of Erie v. Thompkins, 304 U.S. 64, 54 S.Ct. 817, 82 L.Ed. 1188, applies,

creating binding precedent.

## CONCLUSION

Flag Container submits that the weight of the precedent, including the decision of the New

York Court of Appeals, means that the theory propounded by Flag Container, that there is no duty

to warn or protect against an open and obvious hazard, is correct and the law of the land in New York. As such, Flag Container respectfully requests that the Court grant its Motion for Summary Judgment dismissing all claims against it at plaintiff's costs.

Respectfully submitted:

**GEORGE D. FAGAN, T.A. (#14260)**
**WILLIAM W. NEWTON (#23229)**
Leake & Andersson, L.L.P.
1100 Poydras Street
1700 Energy Centre
New Orleans, Louisiana 70163
Telephone: (504) 585-7500
Facsimile: (504) 585-7775

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing pleading has been delivered to all counsel of record, either by depositing a copy of same in the United States mail, first class postage prepaid, by hand delivery or by facsimile transmission, on July 18, 2003, at their last known address of record.

F:\35936\PLEAD\REPLY.MEM

-8-

**EXHIBIT**



2A



2B





2 C

2 D

2E



2F

26

**EXHIBIT**



1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3   MICHAEL CASCIO              *   CIVIL ACTION

4   VERSUS                      *   NO: 02-2115

5   TMA MARINE, INC. AND GREAT  *   SECTION "L"
    LAKES DREDGE AND DOCK
6   COMPANY                     *   MAG.5 (MAG. CHASEZ)
                                    JUDGE FALLON
7   * * * * * * * * * * * * * * * * * * * * * * * * *

8

9

10

11

12          The sworn statement of **SCOTT CASTILLE** taken

13   in connection with the captioned cause, pursuant to

14   the following stipulation before Yvonne Hoffpauir,

15   Certified Court Reporter and Notary Public, at

16   Hampton Inn Lafayette, 2114 West Willow Street,

17   Scott, Louisiana, on Thursday, March 13, 2003,

18   beginning at or about 11:35 A.M.

19

20

21

22

23

24

25

APPEARANCES:


FOR THE DEFENDANTS, TMA MARINE, INC.:

        MR. STANLEY J. COHN
        LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD
        601 POYDRAS STREET
        PAN-AMERICAN LIFE CENTER
        SUITE 2775
        NEW ORLEANS, LOUISIANA  70130



FOR THE DEFENDANTS, FLAG CONTAINER SERVICES:

        MR. LOUIS P. BONNAFFONS
        LEAKE & ANDERSSON
        1100 POYDRAS STREET
        1700 ENERGY CENTRE
        NEW ORLEANS, LOUISIANA  70163-1701

| | |
|---|---|
| 1 | **SCOTT CASTILLE,** |
| 2 | the witness hereinbefore named, after being first |
| 3 | duly cautioned and sworn to tell the truth, the |
| 4 | whole truth and nothing but the truth, testified on |
| 5 | oath as follows: |
| 6 | QUESTIONS BY MR. BONNAFFONS: |
| 7 | Q Mr. Castille, my name is Lou Bonnaffons and I |
| 8 | represent Flag Containers Services in a lawsuit |
| 9 | that's been filed on behalf of Mr. Cascio for |
| 10 | injuries he alleges to have sustained as a |
| 11 | result of an incident which occurred on |
| 12 | February 26th, 2002. It's nice to meet you |
| 13 | today. |
| 14 | A Nice to meet you, too. |
| 15 | Q I appreciate your time. I'm just going to take |
| 16 | a few minutes and ask you some questions to |
| 17 | find out what you know about this incident |
| 18 | involving Mr. Cascio. Okay? |
| 19 | A Yeah. |
| 20 | Q All right. Before we get into the details of |
| 21 | this accident, let me ask you some general |
| 22 | questions about yourself. Where is your full |
| 23 | legal name? |
| 24 | A Scott James Castille. |
| 25 | Q And what's your date of birth? |

| | | |
|---|---|---|
| 1 | A | February 15th, 1969. |
| 2 | Q | And your social security number? |
| 3 | A | 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. |
| 4 | Q | What is your current address? |
| 5 | A | I got -- most of my mail goes to my sister's. |
| 6 | Q | Okay. What's your sister's name? |
| 7 | A | Joanne Broussard. |
| 8 | Q | Joanne Broussard? |
| 9 | A | Yeah. |
| 10 | Q | And what's that address? |
| 11 | A | 2815 Mills Street. |
| 12 | Q | How do you spell that? |
| 13 | A | M-i-l-l-s. |
| 14 | Q | Okay. |
| 15 | A | They got Lafayette. They put Lafayette. |
| 16 | Q | And what's the zip, do you know? |
| 17 | A | 70 -- let's see. 705 -- |
| 18 | Q | That's all right. Don't worry about it. |
| 19 | | What I'm concerned about is the best way to |
| 20 | | try and find to locate you down the road if it |
| 21 | | becomes necessary to find you. Would the best |
| 22 | | method for finding you be to go through your |
| 23 | | sister -- |
| 24 | A | Yeah. |
| 25 | Q | -- Joanne Broussard? |

| | | |
|---|---|---|
| 1 | A | Because she take care of my bills and all that. |
| 2 | Q | Okay. What's her phone number? |
| 3 | A | 337-896-8162. |
| 4 | Q | Do you have some other phone number that you |
| 5 | | use? |
| 6 | A | I got my phone number.     ' |
| 7 | Q | What's your phone number? |
| 8 | A | 337-886-8811. |
| 9 | Q | All right. Who are you currently working for? |
| 10 | A | Kent Stage. |
| 11 | Q | Kent Stage. And you're working for him as a |
| 12 | | deckhand? |
| 13 | A | Deckhand. |
| 14 | Q | How long have you been working for Kent Stage? |
| 15 | A | I'm back with them now about a couple of |
| 16 | | months; three (3) or four (4) months. |
| 17 | Q | I'm going to ask you some questions about the |
| 18 | | incident involving Mr. Cascio now. All right? |
| 19 | | On February 26th of 2002 when the incident with |
| 20 | | Mr. Cascio occurred, who were you working for? |
| 21 | A | TMA Marine. |
| 22 | Q | TMA Marine? |
| 23 | A | TMA Marine. |
| 24 | Q | How long had you been working for them when the |
| 25 | | accident occurred? |

| | | |
|---|---|---|
| 1 | A | Almost about a year at least. |
| 2 | Q | And you were working for them as a deckhand? |
| 3 | A | Deckhand, too. |
| 4 | Q | All right. Do you recall the incident |
| 5 | | involving Mr. Cascio? |
| 6 | A | Yeah. |
| 7 | Q | Tell me what you recall occurring. How did it |
| 8 | | happen, in other words? |
| 9 | A | Okay. We -- we was at that dock, a Great Lakes |
| 10 | | dock, and then we moved that barge, mud barge, |
| 11 | | from that dock to Flag dock. |
| 12 | Q | We're going to go through this step by step. |
| 13 | | Okay? You're telling me that you all were at |
| 14 | | the Great Lakes dock and then you all were |
| 15 | | moving a mud barge to the Flag Container dock? |
| 16 | A | To the Flag Container dock. |
| 17 | Q | Is that right? |
| 18 | A | Yeah. |
| 19 | Q | Had you ever been to the Flag Container dock |
| 20 | | before the time that this happened? |
| 21 | A | I never been -- I never been there before. |
| 22 | Q | Okay. After you moved the mud barge to the |
| 23 | | Flag Container dock, tell me what happens. |
| 24 | A | Okay. We moved it. We got close. We came |
| 25 | | close by the dock. And we got by the dock, and |

| | | |
|---|---|---|
| 1 | | then he jumped onto the eighteen-wheeler. |
| 2 | Q | When you say he, do you mean Mr. Cascio? |
| 3 | A | Yeah, Mr. Cascio. He jumped on by the |
| 4 | | eighteen-wheeler, on the hood. And then he got |
| 5 | | down and then we -- he tied a line. He was |
| 6 | | walking like about five (5) or ten (10) minutes |
| 7 | | across, back and forth. |
| 8 | Q | And then what happens? |
| 9 | A | And then he come back and then he backed up |
| 10 | | into the hole. |
| 11 | Q | When you first arrived at the Flag Container |
| 12 | | dock, was it daylight? |
| 13 | A | It was daylight. |
| 14 | Q | Could you see the dock clearly? |
| 15 | A | I could see the dock clearly. I could see the |
| 16 | | hole clearly. |
| 17 | Q | You could see the man hole? |
| 18 | A | I could see the man hole clearly. |
| 19 | Q | And you were able to see the man hole clearly |
| 20 | | from where you were located on the mud barge? |
| 21 | A | Yeah. |
| 22 | Q | And was Mr. Cascio on that mud barge with you |
| 23 | | when you first pulled up to the dock? |
| 24 | A | Yes, he was with me. |
| 25 | Q | Did Mr. Cascio see the man hole when he was |

| | | |
|---|---|---|
| 1 | | still on top of the barge as you all were |
| 2 | | pulling up to dock? |
| 3 | A | Yeah, he seen it. He seen the hole. |
| 4 | Q | And the two of you spoke about that man hole? |
| 5 | A | We spoke about it. |
| 6 | Q | That's yes? |
| 7 | A | Yeah. |
| 8 | Q | Okay. And the reason you spoke about it was |
| 9 | | because the cover was off of the man hole? |
| 10 | A | Yeah. |
| 11 | Q | And you knew that Mr. Cascio would be walking |
| 12 | | along that dock? |
| 13 | A | Yeah. |
| 14 | Q | And what did you tell him? |
| 15 | A | I told him, I said -- when he come down, I |
| 16 | | hollered, I said, "Look out for the hole," and |
| 17 | | a few second again. I hollered twice, and I |
| 18 | | told him again. I told him twice. |
| 19 | Q | You told him twice after he was down on the |
| 20 | | dock? |
| 21 | A | I told him when he jumped down to that -- you |
| 22 | | know, to the eighteen-wheeler, and then a |
| 23 | | little while later I told him again. |
| 24 | Q | Did you also tell him once when you all were |
| 25 | | still on top the barge when you were first |

| | | |
|---|---|---|
| 1 | | pulling in? |
| 2 | A | Yeah, when we were first pulling in. |
| 3 | Q | So both of you see the open man hole when |
| 4 | | you're still on top the mud barge and you pull |
| 5 | | into the Flag Container dock; right? |
| 6 | A | Yeah. |
| 7 | Q | Then when he's getting down, after jumping on |
| 8 | | the hood of the eighteen-wheeler, you tell him |
| 9 | | again about the man hole? |
| 10 | A | I told him again. |
| 11 | Q | And then a little while later, just before he |
| 12 | | steps into the man hole, you told him again |
| 13 | | about the open man hole? |
| 14 | A | I had told him -- I had told him twice. It was |
| 15 | | twice I told him. Once he jumped on the hood |
| 16 | | of it and then I told him again, a few seconds. |
| 17 | Q | The last time you told him about the man hole |
| 18 | | was just before he stepped into it? |
| 19 | A | Just before he stepped into it. |
| 20 | Q | Now, while he was down on the dock, the two of |
| 21 | | you were attempting to tie up lines to secure |
| 22 | | the barge to the dock? |
| 23 | A | Yeah. |
| 24 | Q | You had one end of the line? |
| 25 | A | I had one end of the line. He held the other |

```
 1        end of the line.
 2   Q    How many lines did you attend to tie up?
 3   A    We was going to tie up five (5) lines.
 4   Q    Okay.  And what line was it that the two of you
 5        were securing when he falls into the man hole?
 6   A    The bow line.
 7   Q    The bow line?
 8   A    Yeah.  All the way in the front.
 9   Q    How many lines had you tied up before he fell?
10   A    We tied up one.
11   Q    So this would have been the second line that
12        you all were trying to tie up when he fell?
13   A    No, the first line.
14   Q    This was still the first line?
15   A    The first line.
16   Q    Had you tied up your end of that first line --
17   A    I tied up my end of the first line.
18   Q    -- the barge --
19   A    To the barge.
20   Q    -- before he fell?
21   A    Before he fell.
22   Q    Was your end of the line securely tied to the
23        barge?
24   A    It was securely tied to the barge.
25   Q    Was there any problem with your end of the
```

| | | |
|---|---|---|
| 1 | | line? |
| 2 | A | No. |
| 3 | Q | How long did Mr. Cascio walk around that dock |
| 4 | | before he fell? |
| 5 | A | A few seconds. |
| 6 | Q | Had he been down there for a few seconds, or a |
| 7 | | few minutes, or -- what long period of time was |
| 8 | | it that he was walking up and down that dock? |
| 9 | A | About five (5) or ten (10) minutes. |
| 10 | Q | During the five (5) to ten (10) minutes that |
| 11 | | he's walking up and down that dock before he |
| 12 | | falls, does he walk past that open man hole? |
| 13 | A | He walked -- he walked before the man hole. |
| 14 | Q | Was he, at anytime before he fell, walking |
| 15 | | between the open man hole and the cleat that he |
| 16 | | was tieing onto? |
| 17 | A | He was walking -- yeah, he was walking, you |
| 18 | | know, back. |
| 19 | Q | He walked back and forth between that area? |
| 20 | A | That area. |
| 21 | Q | Is that a yes? |
| 22 | A | Yeah. |
| 23 | Q | From your conversations with Mr. Cascio and |
| 24 | | from what you saw while you were on top that |
| 25 | | barge, do you believe Mr. Cascio knew that that |

| | | |
|---|---|---|
| 1 | | man hole was there and that he was opened |
| 2 | | before he fell? |
| 3 | A | He knew before that man hole was, you know, |
| 4 | | before he fell. |
| 5 | Q | And he had even told you while you all were on |
| 6 | | top of the barge that he saw the open man hole? |
| 7 | A | Yeah. |
| 8 | Q | And that was before he even got down off the |
| 9 | | barge: right? |
| 10 | A | Uh-huh (yes). |
| 11 | Q | Is that a yes? |
| 12 | A | Yeah. |
| 13 | Q | Okay. When Mr. Cascio fell, was he walking |
| 14 | | backwards? |
| 15 | A | He was walking backwards. |
| 16 | Q | Was he holding a radio? |
| 17 | A | He was holding a radio. |
| 18 | Q | And was he holding the line, or the rope, in |
| 19 | | his other hand? |
| 20 | A | In his other hand. |
| 21 | Q | Is that yes? |
| 22 | A | Yeah. |
| 23 | Q | Where was Mr. Cascio looking when he fell? |
| 24 | A | He was looking up at me. |
| 25 | Q | Okay. When you told him, "Look out for the man |

| | | |
|---|---|---|
| 1 | | hole," just before he fell, did he do anything |
| 2 | | to indicate to you that he heard what you said? |
| 3 | A | He heard what I -- he shook his head.  He heard |
| 4 | | what I said.  I hollered.  I hollered, I said, |
| 5 | | "Look out for the hole." |
| 6 | Q | And did he look up at you? |
| 7 | A | And he looked up at me and he shook his head. |
| 8 | Q | He shook his head up and down? |
| 9 | A | Up and down. |
| 10 | Q | Meaning yes, I -- |
| 11 | A | Yeah.  He saw the hole. |
| 12 | Q | Okay.  At anytime before this incident |
| 13 | | occurred, had Mr. Cascio used the ladder that |
| 14 | | leads from the barge to get onto the dock? |
| 15 | A | No, he didn't. |
| 16 | Q | He just jumped onto that eighteen-wheeler? |
| 17 | A | Eighteen-wheeler. |
| 18 | Q | When you arrived at the Flag Container dock, |
| 19 | | was anybody there? |
| 20 | A | They had somebody came that -- that night.  I |
| 21 | | was almost dark when somebody came. |
| 22 | Q | That was after Mr. Cascio had fallen? |
| 23 | A | Yeah. |
| 24 | Q | At the time you first pulled up, though, was |
| 25 | | there anybody on that dock? |

```
1    A    No, there wasn't.

2    Q    When Mr. Cascio fell, was there anybody on that

3         dock?

4    A    No, there wasn't.

5    Q    Have you ever spoken to anybody that you

6         believe was employed by or working for Flag

7         Container?

8    A    No, I didn't -- I didn't talk to nobody.

9    Q    Okay.  Who sent the barge to Flag Container?

10   A    Great Lakes.

11   Q    Do you know what person it was that said to

12        move the barge to Flag Container?

13   A    All I know is it was one of them supervisors

14        over there.  I don't know his name or nothing.

15        They had like a supervisor.

16   Q    Did anybody tell you or did you overhear

17        anybody say that that barge needed to get to

18        Flag Container's dock by a certain time?

19   A    I was up in the wheelhouse and they said we got

20        to move, you know, while we still have

21        daylight.

22   Q    But did anybody say a certain time?

23   A    They said no certain time.

24   Q    And when you arrived at that Flag Container

25        dock, it was daylight?
```

| | | |
|---|---|---|
| 1 | A | It was daylight. |
| 2 | Q | When Mr. Cascio fell into the man hole, was it |
| 3 | | still daylight? |
| 4 | A | It was still daylight. |
| 5 | Q | From where you were on the barge, did you |
| 6 | | actually -- where you able to actually see Mr. |
| 7 | | Cascio fall into the man hole? |
| 8 | A | Yeah. |
| 9 | Q | And you actually saw him stepping backwards |
| 10 | | just before he fell into the man hole? |
| 11 | A | Yeah. |
| 12 | Q | From where you were sitting and what you were |
| 13 | | seeing, did it appear that Mr. Cascio was |
| 14 | | paying attention to what he was doing? |
| 15 | A | I don't think he was paying attention, no. |
| 16 | Q | Mr. Castille, I appreciate your time.  Thank |
| 17 | | you very much for coming down here today. |

18              MR. BONNAFFONS:

19                   We're off the record now.

20                   (WITNESS EXCUSED)

21              (SWORN STATEMENT CONCLUDED AT 11:50 A.M.)

22

23

24

25

                NAT DOUGET COURT & VIDEO REPORTERS          15

1        **C E R T I F I C A T E**

2

3

4    I, YVONNE HOFFPAUIR, Shorthand Court Reporter and

5    Notary Public, do hereby certify that the above and

6    foregoing testimony was taken by the undersigned and

7    represents a true and correct copy of the

8    proceedings had at the time and place set forth on

9    page one (1) hereof.

10

11   IN WITNESS WHEREOF, I have hereunto affixed my

12   signature at Lafayette, Louisiana this 24th day of

13   March, 2003.

14

15

16   
        _____
17       Yvonne Hoffpauir,  LA CCR #91109

18       OFFICIAL SEAL
         YVONNE G. HOFFPAUIR
19       Certified Court Reporter
         in and for the State of Louisiana
         Certificate Number 91109
20       Certificate expires 12-31-03

21

22

23

24

25

EXHIBIT

C

110 A.D.2d 805
488 N.Y.S.2d 68
(Cite as: 110 A.D.2d 805)

H

Robert Cimino et al., Respondents,
v.
Town of Hempstead, Appellant.

Supreme Court, Appellate Division, Second
Department, New York

April 22, 1985

OPINION OF THE COURT

Mangano, J. P., Gibbons, Bracken and Niehoff, JJ., concur.

In a negligence action to recover damages for personal injuries, etc., defendant appeals from an order of the Supreme Court, Nassau County (Wager, J.), dated June 22, 1984, which denied its motion for summary judgment dismissing the complaint.

Order reversed, on the law, with costs, motion granted, and complaint dismissed.

On August 5, 1979, plaintiff Robert Cimino suffered severe injuries when he was struck from behind by a large wave while he was exiting the water at the defendant Town of Hempstead's Malibu Beach. He thereafter commenced this negligence action against the town, alleging that the defendant, through its lifeguards, had a duty either to warn him of the existing wave conditions or to close the beach because of those conditions. We hold, as a matter of law, that neither duty existed in this case. Plaintiffs' version of the facts clearly shows that plaintiff Robert Cimino, upon first arriving at the beach, observed that the waves were high and the water conditions were generally turbulent. He was also told by other bathers that the ocean was "really rough" that day. He then entered the water and remained in it for some 20 minutes, experiencing its turbulence.

Less than two hours later, Mr. Cimino observed that the waves were 8 to 10 feet in height, and were knocking people down. He entered the water again and engaged in bodysurfing (a practice of riding the waves without a surfboard by planing on the chest and stomach) for about 15 minutes. He was then injured as he was exiting the water in order to have lunch.

We recognize that a duty of care is owed by a municipality to those who are lawfully present on its recreational premises (see, *Caldwell v. Village of Island Park*, 304 NY 268). However, we find the plaintiffs' claim that the town had a duty to warn Mr. Cimino of the wave activity to be without merit. It is clear from the record that the water conditions were readily observable to all at the beach, and were in fact not only observed by Mr. Cimino but actually physically experienced by him when he *806 entered the water on two separate occasions. In a somewhat similar case, we noted that "the value of a warning is particularly questionable where, as here, the claimant knew or should reasonably have known of the dangers posed" (*Herman v. State of New York*, 94 AD2d 161, 163, affd 63 NY2d 822). Moreover, it is well settled that "[t]here is no duty to warn against a condition that can be readily observed by the reasonable use of senses" (*Olsen v. State of New York*, 30 AD2d 759, affd 25 NY2d 665; see, *Pope v. State of New York*, 198 Misc 31, affd 277 App Div 1157).

We further find that defendant had no duty to close the beach merely because of the wave activity. While wave conditions had been worse on each of the two days preceding the day of Mr. Cimino's injury, there is no evidence that any similar accidents occurred on either of those dates, or even on any prior occasion.

Therefore, it can hardly be said that the town was on notice of an unreasonable risk of danger which would require it to close the beach to bathers. The fact that Mr. Cimino was injured in a freak accident does not, by itself, prove that such an unreasonable risk of danger existed.

Copr. (c) 2001, Randy A. Daniels, Secretary of State, State of New York.

N.Y.A.D.,1985.

CIMINO V HEMPSTEAD

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works